1  CHAD D. NARDIELLO (Cal. Bar. No. 224837)
   Nardiello Law Firm, PLC
2  1875 Century Park East, Ste. 700
   Los Angeles, California 90067
3  Telephone:      (310) 284-3157
   Facsimile:      (310) 284-3158
4  E-mail: Chad@NardielloLaw.com

5  Attorney for Defendant
   DAVID LORENZO GARCIA

6

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,          No. CR 15-707-R

         Plaintiff,                DEFENDANT DAVID L. GARCIA'S
                                   SENTENCING MEMORANDUM IN SUPPORT
             v.                    OF A SENTENCE OF TIME SERVED AND
                                   SUPERVISED RELEASE, WITH
DAVID LORENZO GARCIA,              CONDITIONS

         Defendant.                **CURRENT SENTENCING HEARING DATE:**
                                                        **07/25/2016**

## Table of Contents

I.    INTRODUCTION.................................................5

II.   DAVID GARCIA'S BACKGROUND...................................7

      A.   Methamphetamine Gets Introduced To A Vulnerable Child.....7

      B.   A Child With Stunted Mental Development...................7

      C.   David's Addiction........................................8

      D.   David's Recovery.........................................9

      E.   The Importance of Employment............................11

III.  BACKGROUND FACTS RELATING TO OFFENSE CONDUCT...............12

      A.   The United States' Recognition of David's Limited
           Involvement And Minimal Role............................13

      B.   How David Became Involved...............................13

IV.   ANALYSIS: THE SECTION 3553(a) FACTORS FAVOR A DOWNWARD
      VARIANCE...................................................14

      A.   Nature And Circumstance of David's Offense..............17

           1.   Mitigating Role Adjustment Is Insufficient.........17

           2.   David Lacked Knowledge Of The Specifics............18

           3.   David's Brief Temporal Involvement.................19

      B.   David's History & Characteristics.......................20

           1.   David's Adversities................................20

           2.   David's Positives..................................21

      C.   The Sentence Should Be "Sufficient, But Not Greater
           Than Necessary".........................................22

      D.   Available Sentences.....................................24

      E.   Sentencing Guidelines...................................25

      F.   Unwarranted Disparities.................................26

      G.   Restitution.............................................27

V.    CONCLUSION.................................................28

# Table of Authorities

STATUTES

18 U.S.C. §3553.............................................................passim

18 U.S.C. §3583.................................................................24

18 U.S.C. §3585.................................................................24

21 U.S.C. §802..................................................................13

21 U.S.C. §841..................................................................13


CASES

*Gall v. United States*, 552 U.S. 38 (2007)...................14, 15, 25

*Kimbrough v. United States*, 552 U.S. 85 (2007).........15, 16, 25, 26

*Nelson v. United States*, 555 U.S. 350 (2009).......................15

*Rita v. United States*, 551 U.S. 338 (2007).....................16, 25

*Spears v. United States*, 555 U.S. 261 (2009)...................15, 16

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)......19

*United States v. Booker*, 543 U.S. 220 (2005)...................15, 16

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008)...............25

*United States v. Castellanos*, 2008 U.S. Dist. LEXIS 101640
    (D. Neb. Dec. 29, 2008).........................................19

*United States v. Garcia*, 497 F.3d 964 (9th Cir. 2007).............20

*United States v. Jaber*, 362 F. Supp. 2d 365 (D. Mass. 2005)....18, 19

*United States v. Mendoza*, 121 F.3d 510 (9th Cir. 1997)............19

*United States v. Perella*, 273 F. Supp. 2d 162, 164 (D. Mass
    2003)........................................................23, 24

*United States v. Thomas*, 595 F. Supp. 2d 949 (E.D. Wis. 2009)......18

*United States v. Verkhoglyad*, 516 F.3d 122 (2d Cir. 2008).........15


UNITED STATES SENTENCING GUIDELINES

Section 2D1.1...................................................25

Section 3B1.1......................................................13

Section 3B1.2..................................................17, 18

OTHER AUTHORITIES

British Dyslexia Association, *Dyslexia And Specific Learning Difficulties In Adults*, (visited July 8, 2011), http://www.bdadyslexia.org.uk/dyslexic/dyslexia-and-specific-learning-difficulties-in-adults.......................8

National Institute of Justice, *Five Things About Deterrence*, Office of Justice Programs, U.S. Dept. of Justice, (visited July 8, 2011), http://nij.gov/five-things/pages/deterrence.aspx.................................23

Presentence Investigation Report...............................passim

## Index

Exhibit A ........................................................29

Exhibit B ........................................................30

Exhibit C ........................................................31

Defendant David Lorenzo Garcia, by and through his counsel of record, Chad Nardiello, hereby submits this sentencing memorandum in support of a sentence of time served and supervised release, with conditions described below.

**I.   INTRODUCTION**

David's Co-Defendant, Jessica Lopez, sent him on what turned out to be a fool's errand: to pick up narcotics in Los Angeles and return to Lopez.  This was David's first and only interaction with Lopez, as well as the alleged conspiracy.  David made the fateful decision to leave Rosarito, Mexico and go to Los Angeles because he was trying to get paid for doing a task for Lopez's then-boyfriend.  That task: moving furniture.  The methamphetamine was an acceptable form of payment because David was an addict with an addiction that stretched for nearly one-half of his lifetime.

David is not the typical drug offender.  He has never been in a gang nor does he have tattoos.  He has never sold drugs or been an ongoing participant in a conspiracy to sell drugs.  He has never committed an offense involving a weapon.  And he is not a violent person.

The impetus for David's conduct in the instant offense, and the other missteps in his life, can all be traced back to one thing: his methamphetamine addiction.  David has been unable to maintain relationships with the mothers of his two children, or the children themselves.  He has lost employment due to his addiction.  And he has also committed other offenses due to his addiction.

David is now in a good place.  He has been sober for five months, attends daily therapy meetings, and is learning the skills to effectively manage his addiction while in his current in-patient

1   treatment center.  David has also been promoted multiple times while
2   at the treatment center and distinguished himself as an "Employee-of-
3   the-Month" as well as a "Motivator" responsible for assisting in the
4   recoveries of other residents.  He has also taken steps to obtain his
5   GED, driver's license, and Social Security card so that he can obtain
6   compensable employment as soon as he is able.

7        David regrets his conduct, and he regrets that the Court and the
8   United States have had to expend resources to charge and sentence
9   him.  David also takes full responsibility for his crime, and he is
10  willing to do what it takes to make amends.  He also hopes to obtain
11  continuing treatment for his addiction, as he understands that such
12  treatment is the key to him avoiding future violations of the law.

13       The focus of David's sentencing determination should be on his
14  recovery and reintegration into society.  David has already
15  experienced the deterrent effect of the legal system by being
16  charged, pleading guilty, serving 30 days in jail, living under the
17  control and supervision of the government, being subject to regular
18  drug testing, and facing society as a federal felon.  The public's
19  cause, as well as David's, is best served by him continuing his drug
20  treatment outside of prison and allowing him to move forward with
21  attaining financial and emotional self-sufficiency.  This is the most
22  well recognized means of ensuring that he does not reoffend.  He
23  cannot achieve those goals with a sentence that includes further
24  incarceration.  Such a sentence will only derail those goals and make
25  meaningless the successes he has had to date.

26       For these reasons, David respectfully requests a sentence that
27  consists of incarceration limited to time served, supervisory
28  release, 200 hours of community service, drug treatment and testing,

compensable employment, and any other conditions the Court wishes to impose.

## II.  DAVID GARCIA'S BACKGROUND

### A.  Methamphetamine Gets Introduced To A Vulnerable Child

David, being an industrious soul, set out at the just post-pubescent age of 16 or 17 to find a job that could pay him a decent wage and allow him to provide for himself.  David was successful, and found a job painting cars at an auto body shop in San Diego. Unbeknownst to David, the owners of the business were dealers in methamphetamine.  When the business fell on hard times and could not afford to pay its employees in money, the owners offered the drug as a portion of David's compensation.  Presentence Investigation Report ("PSR"), para. 42.  David, having no concept at such a young age of the dangers of the drug, accepted and took his first dosage.  From that point forward, David has lived with his addiction.

### B.  A Child With Stunted Mental Development

As a child, David did not have a close relationship with either his mother or father.  This left a void where positive influence should have prevailed.  David's parents did not impress upon him the importance of surrounding himself with upstanding people, nor the importance of avoiding drugs, nor the importance of avoiding criminal activity.  David fell into each one of these scenarios.  David also made a fateful decision to leave school in the ninth grade.  PSR, para. 42.  David is unable to read and write.  For example, David required assistance in completing rather simple questions on the U.S. Probation Office's intake forms, such as your family members' names. Because of teasing and embarrassment by his classmates at these

failings, David removed himself from such hostilities and left school.  *Id.*

The inability to read and write is reflective of a more severe condition: David has been diagnosed with dyslexia. *Id.*  This condition "affects the way information is processed, stored and retrieved, with problems of memory, speed of processing, time perception, organization and sequencing."  British Dyslexia Association, *Dyslexia And Specific Learning Difficulties In Adults*, (visited July 8, 2011), http://www.bdadyslexia.org.uk/dyslexic/dyslexia-and-specific-learning-difficulties-in-adults.  A learning disability of this type indicates that David has a reduced capacity to comprehend concepts.

**C.   David's Addiction**

As any addict would readily attest, dealing with an addiction to narcotics is a life-long endeavor.  It is not something that is ever eliminated; rather, it is something that one learns to manage.  David is now 33 years old and he has been living with his addiction for nearly one-half of his life.  PSR, para. 51.  It has run roughshod over his decision making.  It has led him to commit crimes so that he can serve his addiction, as in this case.  PSR, para. 52.  It has led him to forsake relationships with his daughter and his son.  *Id.*  It has led him to lose jobs that he desperately needed and wanted.  It also led him to be blind to the consequences of his actions.

David's addiction was severe prior to his recent arrest.  He was using methamphetamine on a daily basis.  He would work odd jobs, sell personal possessions, and do whatever it took to get the drugs.  David has taken the drug in nearly every form imaginable; he has snorted it, drank it, and inhaled it.  PSR, para. 51.  David and his

family have tried before to get control over his addiction by going to a treatment center.  But those facilities were in Mexico and did not offer the same level of treatment and care that is normally found in the United States.  Thus, David was ill-equipped to manage his addiction, and ultimately, he fell back under its control.

**D.   David's Recovery**

Nothing is more important in David's life than his recovery. This includes the ability to manage his addiction, be a parent, be a brother and a son, find a paying job, get a driver's license, get a Social Security card, and become self-sufficient.  David is already well on his way.

As part of his bail conditions, David was remanded to the supervision of Pre-Trial Services so that he could partake in an in-patient rehabilitative and drug treatment program at Phoenix House in Santa Ana, California.  It is a six-month program, and David has been there since February 18, 2016.  Since arriving at the Phoenix House nearly five months ago, David has tested negative each time for the presence of narcotics in his system.  Attached hereto as **Exhibit A** is a copy of a June progress report prepared by David's counselor, Douglas Tucker, Sr. MHS, CATC IV, wherein he writes that David "is fully compliant with testing protocol, rendering all 'negative' results."  In addition, he attends daily Narcotics Anonymous meetings at the Phoenix House.  He also attends Narcotics Anonymous meetings outside of and independent from the Phoenix House on Mondays, Tuesdays and Wednesdays.  For the outside meetings, David organizes a group of approximately 10 other Phoenix House residents to attend by preparing a list on the Friday before the meetings.  He then gets the signature of the meeting host and returns that to the management at

Phoenix House.  As Mr. Tucker noted in the progress report, David is
"fully committed to his recovery, and has continued making exemplary
progress in exceeding his personal and treatment goals and
objectives," and "is diligent in his attendance and participation to
all group, individual, and educational counseling sessions."  Exhibit
A; PSR, para. 9.  David's counselors are so impressed by his
abilities to manage his addiction that they have elevated him to the
role of Motivator.  This position requires him to take on a
leadership position in the Phoenix House such that David is now
responsible for assisting in the recoveries of the other residents.
Mr. Tucker described David as follows: "[his] initiative to be active
in the therapeutic community makes him invaluable to his peers."
Exhibit A.

     As David has matured, he is also realizing that he has been
blessed with two people in this life that have been pushed aside by
his addiction: his two children.  David's daughter (now 16 years old)
and his son (now 6 years old) do not know their father, and have not
been involved his life.  Recognizing his failings, David enrolled
himself in a 10-week parental training course.  Attached hereto as
**Exhibit B** is a copy of David's certificate of successful completion.
David has also begun to reach out to his children through letters and
other family members.  He has learned that his son would like to come
and live with him.  David has also taken steps to reach out to the
mothers of his children so that he can reestablish relationships.
David understands that this is essential to reconnecting with his
children.

     David's recovery is also bolstered by what is now a familial
support structure.  David's mother and sister now make regular visits

10

to David at the Phoenix House.  They bring him clothes, personal effects, and other items.  They also regularly attend Al Anon meetings, an organization to assist family members that have a loved one suffering from addiction.  David's mother and sister are also helping David with some of the more mundane aspects of reintegrating into society. They have provided David with assistance in completing and filing forms so that he can get a driver's license and a Social Security card.  And in a further sign of their commitment to David's recovery, his family has offered to allow David to live in the family home in San Diego once he has completed his penal obligations.

**E.   The Importance of Employment**

The other major component to David's recovery is employment. This not only allows David to become financially self-sufficient, but more importantly it provides him with an inner stability that he so desperately needs.  David finds his purpose in work, and not just any work but physical labor.  The satisfaction that he gains from working allows him to mentally make sense of his life, and to realize that there is more to life than feeding an addiction.  It also provides him with a sense of pride in himself and to dispense with thoughts of insecurity and inadequacy.  These feelings have a direct effect on his ability to manage his addiction.

David understands the importance of work to his recovery, and he has worked for nearly his entire adult life.  As a resident of Phoenix House, David is required to work at the facility.  David began working as a dishwasher.  In less than one month, he was promoted to a kitchen crew leader, a role that required him to oversee food preparation for the entire facility.  David was then promoted to the head of maintenance and grounds at the Phoenix House.

His recent duties in this position required him to be responsible for overseeing and painting the exterior of the property's buildings. Along the way, David earned an employee-of-the-month award for his efforts, a copy of which is attached hereto as **Exhibit C**.

Not being content with his successes at the Phoenix House, David is taking steps to obtain independent, paying employment.  As a means to make himself further marketable, David recently submitted the required materials to obtain his GED certificate.  David has also begun approaching local businesses and submitting job applications in the area of the Phoenix House seeking employment.  David also recently made a call to his old employer, Mr. Saul Escalante.  He employed David as a house painter prior to David's most recent arrest.  Mr. Escalante has known David for over five years and can attest to David's good character, as evidenced by him offering David a job as soon as he is able to work in the San Diego area.

David is also not without marketable skills.  In former jobs, David was required to obtain certifications.  David is certified by OSHA for underground work on mainline pipes and plumbing, i.e., pipes that carry waste from a structure to a sewage system.  He is also certified as a flagman to direct traffic in and around constructions sites and roadways.  These certifications will assist David in his quest to find employment.

By all accounts, David is embracing his recovery.  He is taking every possible step that he can think of to ensure his success.  He also understands the importance of managing his addiction. And perhaps more importantly, he now understands how to manage it.

**III. BACKGROUND FACTS RELATING TO OFFENSE CONDUCT**

## A.    The United States' Recognition of David's Limited Involvement And Minimal Role

David has pled guilty to possession of methamphetamine with the intent to distribute pursuant to 21 U.S.C. section 841(a)(1) and the penalty provision under sub-section (b)(1)(C).  Upon the government's motion, the Court dismissed the related conspiracy charge.  For perspective, the definition of the term "distribute" that appears in the statute is defined quite broadly in Title 21 to mean "deliver." 21 U.S.C. §802(11).  The term deliver is defined to include the "attempted transfer of a controlled substance … whether or not there exists an agency relationship."  21 U.S.C. §802(8).  Thus, the statute does not possess a great deal of rigor when criminalizing conduct involving narcotics.

Perhaps in recognition of the nature of the statute, and certainly in recognition of David's minimal role, the United States stipulated in the plea agreement to a downward guidelines adjustment of four.  *See* United States Sentencing Guidelines ("U.S.S.G"), §3B1.1; PSR, para. 21.  It is doubtless that the following facts among others led to this agreement: (i) David was only involved in one purchase; (ii) David had no prior association with his co-defendants Roberto Macias, Jessica Lopez, and Adriana Aguilar; (iii) David was not involved in selling the narcotics; (iv) David was not part of a criminal enterprise; and (v) David was acting on behalf of another.

## B.    How David Became Involved

David does not embody the typical narcotics convict.  David is not affiliated with a gang.  He has never sold narcotics.  He has never used a weapon in the commission of illegal conduct.  He has

never used violence in furtherance of a drug trade.  Nor does he have any tattoos.  PSR, para. 47.  David is addicted to methamphetamine.

David became involved in the conduct that led to the instant offense by attempting to satisfy his addiction.  While working one evening in a restaurant in Rosarito, Mexico, David engaged in a conversation with a person by the name of Omar.  After David mentioned that he had a pick-up truck, Omar indicated that he had just moved to Rosarito from Los Angeles and was unable to move all of his furniture.  Omar asked David if he would be willing to go to Los Angeles and retrieve the furniture and bring it to Rosarito, and in exchange, Omar would pay David a certain amount of money.  David agreed, and upon delivering the furniture to Omar in Rosarito, the latter stated that he did not have any funds to pay David.  Omar then suggested that David return to Los Angeles to pick up a quantity of methamphetamine and bring it back to Omar's girlfriend, Jessica Lopez.  In exchange, Omar would compensate David with a portion of the narcotics.  Unfortunately, and being under the control of his addiction, David agreed.  While carrying out that task, David was arrested for the instant offense.

What is obvious is that David was not possessed with a mind to become involved in a criminal enterprise.  David was simply trying to satisfy his addiction.

**IV.  ANALYSIS: THE SECTION 3553(a) FACTORS FAVOR A DOWNWARD VARIANCE**

The United States Sentencing Guidelines ("Guidelines") no longer enjoy a presumption of reasonableness.  *Gall v. United States*, 552

U.S. 38, 50 (2007) (a judge "may not presume that the Guidelines range is reasonable"); *Nelson v. United States*, 555 U.S. 350, 352 (2009). As this Court is well aware, the Supreme Court's decision in *Booker v. United States*, 543 U.S. 220 (2005), removed the restraints that bound this Court's sentencing determinations to the Guidelines. The natural consequence is a liberation of this Court in its analyses when deciding to vary. The Court is no longer required to find the presence of "extraordinary circumstances." *Gall*, at 47. The Court is entitled to reject "rigid mathematical formulation" that may have previously weighed on its decisions. *Id.* (no requirement that a variance be within a certain percentage of the Guidelines range). The Court, though it must provide an explanation, is not required to provide an one that is "extensive or detailed." *United States v. Verkhoglyad*, 516 F.3d 122, 136 (2d Cir. 2008) (*citing Gall v. United States*, at 46 ("'proportional' justifications for departures from the Guidelines range is not consistent with our remedial opinion in *United States v. Booker*")). And perhaps most importantly, a presumption of unreasonableness no longer attaches when this Court seeks to vary below the guidelines. *Gall*, at 52.

The Supreme Court has now refocused sentencing determinations such that they are based on an individualized assessment of the person, as well as his or her history, motivations, and character. *United States v. Booker*, 543 U.S. 220, 245 (2005). The Supreme Court encourages sentencing courts to exercise great discretion in imposing a just and fair sentence. *See e.g., Kimbrough v. United States*, 552 U.S. 85 (2007) (Supreme Court upheld a sentence at odds with and below the drug-related provision of the Guidelines); *Spears v. United States*, 555 U.S. 261 (2009) (reaffirming *Kimbrough* that a policy

15

difference is sufficient for a Court to reject the application of a Guidelines provision).  The framework of course is found 18 U.S.C. section 3553(a).  The "overarching provision [for] district courts [is] to 'impose a sentence sufficient, but not greater than necessary.'"  *Kimbrough*, at 101 (*quoting* 18 U.S.C. §3553). The statute describes the seven factors that the Court is to consider in fashioning a sentence: (i) the nature of the offense and history and characteristics of the defendant; (ii) the purpose of sentencing; (iii) the kinds of sentences available; (iv) the Sentencing Guidelines; (v) any pertinent policy statements; (vi) the need to avoid unwanted sentencing disparities among similar offenders; and (vii) the need for restitution to victims.  18 U.S.C. §3553(a); *Rita v. United States*, 551 U.S. 338, 347-48 (2007).  After consideration of those factors, the Court must "tailor the sentence" that is unique to the person and his or her circumstances.  *Booker*, at 245.

Although the Guidelines are a factor that the Court must consider, it is free to reject or disagree with them.  That disagreement could be based on an individualized, case-specific determination that the Guidelines yield an excessive sentence in a particular case.  *See e.g. United States v. Booker*, 543 U.S. 220, 245-46 (2005).  But it could also be based purely on a policy difference that a sentencing judge may have, and grounded in no fact specific to the defendant's case.  *Spears v. United States*, 555 U.S. 261, 264 (2009) (Referring to *Kimbrough v. United States*, 552 U.S. 85 (2007), the Supreme Court pronounced "a recognition of district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them." (*emphasis in original*)).

16

In this situation, full consideration of the section 3553(a) factors warrants a variance for David to a sentence of time served and supervised release, with conditions.  As shown below, this sentence properly takes into consideration David's personal history, the nature of his offense and his limited involvement therein, the punishment and loss that he has already suffered, and the sentences imposed on other defendants for the same or similar offenses.  Most importantly however, such a sentence provides recognition of David's successes in his recovery, and allows him to continue his recovery without the likely adverse consequences that incarceration would bring.

## A.   Nature And Circumstance of David's Offense

David regrets and is incredibly remorseful for his conduct.  He well recognizes that he made a mistake by agreeing to go to Los Angeles to pick up methamphetamine and return it to Ms. Lopez.  That conduct however did not occur within a vacuum.

### 1. Mitigating Role Adjustment Is Insufficient

As the United States recognizes, David's involvement in the offense and with the conduct of his co-defendants is limited.  PSR, para. 22 ("he was substantially less culpable than his co-defendants who distributed").  This is conduct for which David has already served 30 days in federal incarceration.  The United States agreed to a downward adjustment for David because it views him as a "minimal participant" under section 3B1.2(a) of the Guidelines.  This however does not correctly reflect the true nature of David's peripheral involvement.

Sentencing courts have not hesitated to vary significantly from a guidelines sentence where the downward adjustment for a mitigating

role is insufficient.  For example, one court sentenced a defendant to probation and home detention even though he was facing 57 to 71 months for his involvement in a methamphetamine conspiracy because the downward adjustment under section 3B.1.2(a) of the Guidelines was inadequate to account for the defendant's limited role.  *United States v. Jaber*, 362 F. Supp. 2d 365 (D. Mass. 2005) (Defendant had ongoing participation in the conspiracy for seven months and was paid a weekly salary for his role by the lead co-defendant).  In another example, a court sentenced a defendant to five months of incarceration and five months of home confinement, instead of a Guidelines sentence of 27 to 33 months, because the mitigating role adjustment was inadequate.  *United States v. Thomas*, 595 F. Supp. 2d 949 (E.D. Wis. 2009) (Court imposed incarceration because of need for deterrence based on prior drug conviction).

As described above, David decided to make a one-time pick up and transport the narcotics as a means to receive compensation for moving furniture for an acquaintance, and to satisfy his then-insatiable appetite for methamphetamine.  PSR, para. 22 ("There is no indication that Garcia played any role in the distribution of methamphetamine other than picking up the drugs from Macias.").  David was not a participant in a longer-term conspiracy but a mere single-instance functionary.  He did not possess any weapons, resist arrest, or profit from his co-defendants' conduct in any way.

## 2. David Lacked Knowledge Of The Specifics

The extent of David's knowledge regarding the purpose of his visit to Los Angeles was to pick up methamphetamine and return it to Jessica Lopez, and in exchange, David would receive compensation in the form of a small quantity of the narcotic for his prior assistance

18

in moving furniture.  David had no knowledge or control of how much methamphetamine he was picking up.  Nor did he have any knowledge or control over its purity.  As the PSR makes clear, "it does not appear that Garcia had knowledge or understanding of the scope and structure of [Co-Defendant] Macias' methamphetamine distribution enterprise." PSR, para. 22.  Courts have repeatedly used such lack of knowledge as a basis for a downward departure.  *See e.g., United States v. Mendoza*, 121 F.3d 510 (9th Cir. 1997) (Courts "consider a downward departure on the ground of … [defendant's] lack of control over, and knowledge of, the purity of the methamphetamine … possessed for distribution."); *United States v. Jaber*, 362 F. Supp. 2d 365 (D. Mass. 2005) (functionary role with lack of knowledge regarding methamphetamine conspiracy warranted departure to probation).

### 3. David's Brief Temporal Involvement

As described in detail above, David was involved with his co-defendants on only one occasion that lasted for a portion of one day. Unlike his Co-Defendants Macias and Lopez, as alleged by the United States, David was not engaged in an ongoing conspiracy to possess, traffic in, and sell narcotics.  David made a single trip to Los Angeles so that he could facilitate payment to himself for moving furniture.  Courts have also used a defendant's brief temporal involvement as a basis to vary from the Guidelines.  *See e.g., United States v. Castellanos*, 2008 U.S. Dist. LEXIS 101640 *18 (D. Neb. Dec. 29, 2008) (In a substantial departure from the guidelines, court relied in part on defendant's limited eight-month involvement in drug conspiracy); *United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) (Variance from life in prison to 42 months in part

based on defendant's involvement in a securities-fraud conspiracy's "final months.").

**B.   David's History & Characteristics**

There are multiple bases that are unique to David that should inform this Court of how best to sentence him.  Some of those relate to adversity that David has faced, such as his drug addiction and his dyslexia.  Others relate to his industrious nature and the self-created success that he has had in his recovery thus far.

**1.  David's Adversities**

As described above, David is a recovering methamphetamine addict.  It is a struggle with which he contends on a daily basis. It is also the impetus for him committing the instant offense.  But for David's need to feed his addiction, he would have never put himself in the position to drive to Los Angeles to pick up narcotics.  At that time however, he was not capable of effectively managing his addiction; rather, it exerted control over David's decision making to his severe detriment.

There can be no question that David's decision to engage in the instant offense conduct was brought about by adversities not faced by the average "heartland" defendant.  His mental capacity at the time of the offense was impaired by his drug addiction.  As the Ninth Circuit has made clear, a district court has discretion to consider a defendant's diminished mental capacity due to drug addiction.  *United States v. Garcia*, 497 F.3d 964, 971-72 (9th Cir. 2007) (case remanded

to district court to re-determine sentence to consider drug addiction as basis for diminished mental capacity).

David's dyslexia diagnosis is what led him to leave school in the eighth grade because he was embarrassed by his inability to read and write.  That condition has also been a source of great insecurity to David, an insecurity that he previously attempted to ignore through substance abuse.

### 2. David's Positives

David is quite an industrious and hard-working individual.  He has been working since the age of 15, when he started as an assistant to his father in the cabinet-making industry.  PSR, para. 42.  David has worked ever since in a variety of positions, including as an auto-body shop employee, plumber, construction worker, horse trainer, restaurant employee, and most recently a painter.  David enjoys physical labor and it provides a mental stability and satisfaction that he cannot find elsewhere.

David has also had great success in his recovery.  He has remained sober since entering the Phoenix House.  He attends daily therapy and Narcotics Anonymous Meetings with multiple groups.  He has been promoted two times, and has been awarded a certificate as Employee of the Month.  His counselors have repeatedly attested to his positive influences on his co-residents.  Most notably, he has been assigned the role of Motivator, a position that requires him to assist and lead other residents of the Phoenix House in learning to managing their own substance-abuse problems.  David has also taken steps to obtain his GED, his driver's license and Social Security card.  He has contacted his old employer about a job, and taken

initiative to look for other jobs by canvassing the community near the Phoenix House.  David is solely focused on his reintegration back into society.

**C. The Sentence Should Be "Sufficient, But Not Greater Than Necessary"**

David is remorseful, takes responsibility, and is genuinely sorry for his conduct.  And he does not deny in any way the underlying facts that support the instant offense.  But the purposes of sentencing found in section 3553(a)(2) do not support a further term of incarceration.  Rather, they suggest that David be sentenced to time served, placed under supervisory release, and complete other conditions.  This coupled with the 30 days that David has already spent incarcerated is a sufficient sentence.

The retribution aspect of the statute, i.e., section 3553(a)(2)(A), requires the Court to consider the seriousness of the offense, promote respect for the law, and impose just punishment.  None of these considerations warrants a sentence that includes additional incarceration.  David picked up narcotics on behalf of another person, Jessica Lopez, so that he could obtain compensation for moving furniture for her boyfriend.  David was acting under the burden of his addiction at a time when he had no skills or understanding of how to manage it.  He was not a meaningful player in a larger scheme designed for him to reap profits through narcotics.

As to the need for deterrence, this is not something that David has ever needed.  He does not have a criminal mind; he has an addict's mind.  The thought processes that have caused him to commit

the instant offense, as well as prior offenses, were based on a desire to satisfy his addiction.  The key to David's deterrence is his recovery, and improving his skills in managing his addiction. Courts recognize that the likelihood of recidivism drops significantly when the defendant is able to receive drug treatment outside of prison.  *See e.g., United States v. Perella*, 273 F. Supp. 2d 162, 164 (D. Mass 2003) ("[S]tatistics suggest that the rate of recidivism is less for drug offenders who receive treatment while in prison or jail, and still less for those treated outside of a prison setting.").  Moreover, as the United States Department of Justice recognizes, "prison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect: Inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment."  National Institute of Justice, *Five Things About Deterrence*, Office of Justice Programs, U.S. Dept. of Justice, (visited July 8, 2011), http://nij.gov/five-things/pages/deterrence.aspx.

There is no need to protect the public from further crimes of David; he has not committed any crime that would harm the public. The only harm that was brought about by David's conduct was to himself.

The fourth purpose of sentencing is most poignant in David's case.  It focuses on how to provide David with "correctional treatment in the most effective manner."  18 U.S.C. §3553(a)(2)(D).

23

The treatment that would be most effective to David would be to allow him to continue with his drug treatment so that he is capable of fully managing his addiction.  David is now respectful of the gravity of his addiction, and is focused on his treatment.  The five months that David has spent in the Phoenix House has placed him on the correct path but by no means is his treatment finished.  His treatment successes are self-evident: sobriety, employment promotions, regular therapy attendance, reconnecting with family, admission of responsibility, and acceptance of treatment. Incarcerating David at this juncture would only serve to derail his recovery and eliminate his successes.  David will have a greater likelihood of ultimate success if he is not incarcerated.  *Perella*, at 164.

### D. Available Sentences

This Court does not need to sentence David to any further incarceration for his crime.  He has already served 30 days in a federal jail after his arrest for the instant offense.  That time counts towards any sentence imposed by this Court.  18 U.S.C. §3585(b)(1).  The focus of David's sentence, and the surefire way to further his recovery, is to sentence him to time served with supervised release, plus the following conditions: (i) 200 hours of community service; (ii) further drug treatment and testing; (iii) compensable employment; and (iv) other conditions the Court imposes. The Court is entitled to impose this sentence considering David's 30 days of incarceration.  18 U.S.C. §3583(a).

**E. Sentencing Guidelines**

Notwithstanding the advisory nature of the Guidelines, they are one of the factors set forth in section 3553(a) that the Court should consider but they are entitled to no more weight than any of the other factors.  18 U.S.C. §3553(a)(4); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  Preliminarily, David would note that the PSR appears to contain a typographical error on page three where it refers to the applicable guideline as section 2D1.5(c)(6) – no such section exists; rather, as cited elsewhere in the PSR, it should be a reference to section 2D.1.1(c)(6).  David does not dispute the mathematical computation contained within the PSR, but he does object to the legitimacy of the narcotics guideline at section 2D1.1.

As the Supreme Court in *Rita* explained, the Commission's role in promulgating the Guidelines was/is two-fold: (i) reliance on empirical data of pre-Guidelines sentencing practices; and (ii) continuous revision of the Guidelines based on judicial decisions, empirical data, and comments from participants and experts in the field.  *Rita v. United States*, 551 U.S. 338, 350-51 (2007).  The first Guidelines manual was released by the Commission in 1987, and included a scheme for sentencing in drug cases based on the type and quantity of drug involved.  In other words, it was not based on any empirical data.

The Supreme Court in *Kimbrough* and *Gall*, explained that none of the drug-related provisions in the Guidelines were developed from the "empirical approach."  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007).  Issuing a guideline not based on such empirical data exceeds the Commission's allowable "exercise of its characteristic institutional role."

*Kimbrough*, at 109-10.  This provides a basis for this Court to reject the application of the drug guideline in this case.  *Id.* at 110.

### F. Unwarranted Disparities

The Court must consider the need to avoid unwarranted sentencing disparities between similarly situated defendants.  18 U.S.C. §3553(a)(6).  David submits that the sentences handed out to his co-defendants in this case offer a useful microcosm when fashioning an appropriate sentence.

Jessica Lopez received a sentence of 12 months of incarceration for, among other things, her role in the alleged conspiracy. According to the United States and the PSR, Ms. Lopez was part of an ongoing conspiracy with her Co-Defendant Roberto Macias to transport and sell narcotics.  PSR, para. 22.  It appears that Ms. Lopez was attempting to profit from the scheme, that such scheme was ongoing for multiple months, and that she directed multiple low-level individuals to work for her, including David.

In contrast, and more similar to David's culpability, is Co-Defendant Adriana Aguilar.  She is only alleged to have a limited, one-time involvement in the scheme.  She, like David, was alleged to have been directed to pick up and transport narcotics to Ms. Lopez. Ms. Aguilar however is alleged to have transported nearly 200 percent more narcotics by weight than David.  Like David, Ms. Aguilar reached a plea agreement with the United States, and received recognition for her minimal role (-4) and acceptance of responsibility (-3).  Based on this, the Court agreed that Ms. Aguilar could participate in the Court's Conviction And Sentencing Alternatives ("CASA") program. David has also applied to CASA but is awaiting a response.  This

means that if Ms. Aguilar successfully completes the program, she will not be subject to any further incarceration.

David is even less culpable than Ms. Aguilar. His involvement was brought about by an attempt to obtain payment for moving furniture. He attempted to transport one-third of the amount of narcotics. And he was acting under the burden of his addiction. This warrants a sentence of time served and supervised release, with the conditions outlined above.

**G. Restitution**

As the PSR indicates at paragraph 13, there are no identifiable victims. As the PSR also indicates, David does not have "the ability to satisfy a financial sanction at this time or in the future." PSR, para. 65.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**V.   CONCLUSION**

David is remorseful, and accepts full responsibility for his conduct.  David however is also well on his way to being rehabilitated.  His is not a problem of a malicious mind but one of addiction.  The key to his success will be additional treatment for his drug problem so that he can fully manage the addiction. Incarceration will not aid his cause but only exacerbate the problem. For these reasons, Defendant David L. Garcia respectfully requests that the Court impose a sentence of time already served, supervisory release, along with the conditions of 200 hours of community service, obtain compensable employment, additional drug treatment and testing, and any other conditions the Court decides to impose.

Dated: July 12, 2016             Respectfully submitted,


                                        /s/
                                 _____
                                 CHAD D. NARDIELLO
                                 Attorney for Defendant
                                 DAVID LORENZO GARCIA



**Phoenix House**
Rising Above Addiction

1207 E. FRUIT STREET, SANTA ANA, CA 92701
PHONE (714) 953-9373 ● FAX (714) 953-5775

# Progress Report

Date: 06/01/2016

☐ PC1210              ☐ PSN
☐ AB109               ☐ USPO
☐ Private Pay

Name of Client: David Garcia        Date of Birth: REDACTED

Commitment Days to Program: 120

Enrollment Date: 02/18/2016        Discharge Date: 08/18/2016

☒ Acceptable Progress

☐ Needs improvement

☐ Disciplinary action taken, termination

COMMENTS: Client is fully committed to his recovery, and has continued making exemplary progress in exceeding his personal and treatment goals and objectives. Client exemplifies great leadership in the beautification and maintenance of the overall facility, and proudly serves as a supreme example to his peers in recovery. Client has become a trusted and reliable asset to staff, and shows immense initiative in the performance of his responsibilities. Client is diligent in his attendance and participation to all group, individual, and educational counseling sessions, and is fully compliant with testing protocol, rendering all "negative" results. Client's initiative to be active in the therapeutic community makes him invaluable to his peers, and puts him on track to be successful upon reentry.

*If you have any questions or concerns, please do not hesitate to contact us.*
Phoenix House of California, Orange County
Adult Outpatient Services
Douglas A. Tucker Sr., MHS, CATC IV
(714) 953-9373 ext.4834

PAGE 30

EXHIBIT B

# CERTIFICATE OF COMPLETION

*This Certificate is Awarded to:*

## DAVID GARCIA

IN HONOR OF COMPLETING THE 10 WEEK PARENT TO PARENT PROGRAM ON

4/15/16

DATE

SUPPORTED BY THE ORANGE COUNTY
PREVENTION CENTER

EXECUTIVE DIRECTOR SIGNATURE

PROGRAM EDUCATOR SIGNATURE

**PARENTtoPARENT**™
A PARENT EDUCATION PROGRAM

EXHIBIT B

# Kitchen Woker of the Month

For Providing Leadership and Organizational Skills in the Kitchen

For the Month of February, 2016

This Award is presented to

## David Garcia

This award entitles you to 4 extra hours on your next weekend pass

Brendan Kavanaugh, Program Director



**Phoenix House**
Rising Above Addiction

Kristin Bonfiglio, Deputy Director

PAGE 31

EXHIBIT C